In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3574

KENNETH E. GENTRY,

*Petitioner-Appellant,*

*v.*

MARK R. SEVIER, Superintendent of the Miami
Correctional Facility,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 06-C-350—**Philip P. Simon**, *Judge.*

ARGUED NOVEMBER 10, 2009—DECIDED FEBRUARY 26, 2010

Before POSNER and FLAUM, *Circuit Judges*, and DER-
YEGHIAYAN, *District Judge.*\*

DER-YEGHIAYAN, *District Judge.* On June 10, 1999,
Kenneth E. Gentry was convicted in the Marion Superior

---

\* Hon. Samuel Der-Yeghiayan, District Judge for the Northern
District of Illinois, is sitting by designation.

Court of Indiana on three counts of burglary and three counts of theft. During the trial, the Government introduced evidence that was obtained by police officers during an encounter with Gentry when the police officers searched Gentry's person and a wheelbarrow he was pushing. At no time before or during the trial did Gentry's counsel move to suppress or object to the introduction of the evidence. Gentry's habeas petition asserts that by failing to move to suppress or object to the admission of the evidence obtained from the searches by the arresting officers, Gentry received ineffective assistance of counsel. The district court denied Gentry's habeas petition. For the reasons stated below, we reverse the district court's denial of the habeas petition.

## I. Background

At approximately 2:30 a.m., on February 6, 1999, Kenneth E. Gentry was walking through a residential neighborhood in Indianapolis, Indiana. Gentry was pushing a wheelbarrow containing miscellaneous items such as tools, a cell phone, compact discs, and beer. The items in the wheelbarrow were partially covered by a yellow raincoat.

While Gentry was walking with the wheelbarrow, some items fell out of the wheelbarrow. The noise woke up residents in the area, and upon waking, one resident observed Gentry from a window and called the police. Based on the call, dispatch at the Indianapolis Police Department notified officers over the radio about a "suspicious person" described as a black male wearing dark clothing, including camouflage pants, and pushing

a wheelbarrow. (App. at 1, 3, 59, 147). Two Indianapolis police officers responded to the dispatch. Upon arriving in the area, one officer observed Gentry from the marked patrol car "trotting" with the wheelbarrow. (App. at 60, 147). The officers pulled up in the patrol car without activating their emergency equipment. Gentry put down the wheelbarrow, waved to the officers and began walking towards the patrol car. One officer got out of the car and told Gentry to "keep [his] hands up" while the officer patted down Gentry. (App. at 63). While conducting the pat down, the officer felt something bulky in Gentry's pocket and discovered it was a garage door opener. During this initial contact with Gentry, the officer asked Gentry what he was doing with the wheelbarrow and Gentry indicated that he was going home. The officer observed a hodgepodge of items in the wheelbarrow and the wheelbarrow had the word "Brandt" spray painted on its side. (App. at 4, 61). The officer testified that in plain view he saw some old beat-up stuff, and that he found newer, more valuable items only after he started poking around in the wheelbarrow. (App. at 84, 86-87, 91).

The officer who had been interrogating Gentry then left Gentry with another officer and drove partially down a nearby alley while activating the garage door opener that the officer had earlier obtained from Gentry's pocket. The officer with the garage door opener discovered that the garage door opener opened the garage of a nearby residence owned by Jeff Gill. Meanwhile, the other officer who remained with Gentry continued the search of the wheelbarrow and discovered a toolbox

at the bottom of the wheelbarrow. In the toolbox was a Jiffy Lube receipt that had Gill's name and address on it. The officer with the garage door opener then arrived at the scene with Gill and Gill identified items in the wheelbarrow as his property. Subsequently, Bill Wherling from Brant Construction identified the wheelbarrow and items in the wheelbarrow as those that were stolen from Brandt Construction during a burglary a few days earlier. Bob Kennedy, Gill's next-door neighbor also subsequently identified items in the wheelbarrow as items previously stolen from his garage.

Gentry was charged with burglary and theft, and his case proceeded to trial. Gentry's trial counsel never moved to suppress any evidence or object to the admission of any evidence obtained from the search of Gentry's person or the wheelbarrow. Gentry did file a *pro se* motion to suppress prior to his trial, (App. at 12-16), but the record does not reflect that the trial court ever ruled on the motion or that Gentry's trial counsel ever addressed the *pro se* motion with the court. In June 1999, Gentry was convicted by a jury on three counts of burglary and three counts of theft. Gentry appealed his conviction to the Court of Appeals of Indiana, raising various claims including claims that he received ineffective assistance of counsel due to his counsel's failure to raise Gentry's Fourth Amendment defenses. The Court of Appeals of Indiana found that although the officer who initially approached Gentry did not have reasonable suspicion to pat down Gentry for weapons, the toolbox in the wheelbarrow was independently discovered and would have led the officers to Gill's

garage. The Court concluded that Gentry had not shown ineffective assistance of counsel since Gentry did not show that he was prejudiced by his counsel's failure to object to the introduction of the evidence that was produced by the searches. The Court of Appeals of Indiana affirmed Gentry's conviction on September 8, 2000. Gentry filed a petition for review with the Supreme Court of Indiana, raising the same ineffective assistance of counsel claims. The Supreme Court of Indiana denied review on October 23, 2000. Gentry subsequently filed a *pro se* petition for post-conviction relief in Indiana state court, which was denied on January 27, 2005. Thereafter, Gentry filed a *pro se* appeal with the Court of Appeals of Indiana, which affirmed the lower court on March 15, 2006. Gentry then filed a petition for review with the Supreme Court of Indiana, which was denied on April 13, 2006. On June 2, 2006, Gentry filed his habeas petition in this case, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## II. Discussion

We review de novo the district court's denial of a habeas petition. *Lucas v. Montgomery*, 583 F.3d 1028, 1030 (7th Cir. 2009). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a federal court cannot grant habeas relief to a "person in custody pursuant to the judgment of a State court . . . unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision of a state court is deemed to be "'contrary to' federal law, within the meaning of the federal habeas statute, if the state court either incorrectly laid out governing United States Supreme Court precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable Supreme Court case." *Sutherland v. Gaetz*, 581 F.3d 614, 616 (7th Cir. 2009) (quoting in part 28 U.S.C. § 2254(d)(1)). A state court's "unreasonable application" of precedent of the United States Supreme Court "occurs, within the meaning of the federal habeas statute, when a state court identifies the correct governing legal rule but unreasonably applies it to the facts of a case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context in which it should not apply or unreasonably refuses to extend that principle to a new context in which it should apply." *Id.* (quoting in part 28 U.S.C. § 2254(d)(1)); *see also Emerson v. Shaw*, 575 F.3d 680, 684 (7th Cir. 2009) (stating that for the unreasonable application prong, a petitioner "must show that the [state court's] decision was 'so erroneous as to be objectively unreasonable'") (quoting in part *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006)). The phrase "[c]learly established federal law" in the habeas statute has been interpreted to "mean[ ] the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lucas*, 583 F.3d at

1030 (internal quotations omitted) (quoting in part *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)).

A. Searches Incident to the Arrest

When the officers pulled up in their patrol car and one officer exited the car and told Gentry to "keep [his] hands up," the officer executed a *Terry* stop. (App. at 63). An officer executes a Fourth Amendment seizure when "by means of physical force or show of authority [the officer] . . . in some way restrain[s] the liberty of a citizen." *Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006) (internal quotations omitted) (quoting in part *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The test for assessing whether a seizure for Fourth Amendment purposes has occurred is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979 (1988) (internal quotations omitted) (quoting in part *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980)). A reasonable person in Gentry's position, who saw a marked police car pull up and who was told by a police officer to keep his hands up, would not believe that he was free to leave. *See, e.g., Smith v. Kenny*, 2009 WL 2431949, at *23 (D.N.M. 2009) (considering the fact that the suspect was "order[ed] to exit [a residence] with hands up" in assessing whether a Fourth Amendment seizure had occurred); *United States v. Brown*, 2003 WL 23144858, at *3 (N.D. Ill. 2003) (finding that a *Terry* stop occurred based

on facts such as that the officer "ordered everyone to put their hands up"). Thus, the officer who initially approached Gentry engaged in a Fourth Amendment seizure of Gentry immediately after arriving at the scene.

A law enforcement officer can execute "an investigatory stop when the officer has reasonable suspicion that a crime may be afoot." *United States v. Hampton*, 585 F.3d 1033, 1038 (7th Cir. 2009). In order to conduct an "investigatory stop" consistent with *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer must be 'aware of specific and articulable facts giving rise to reasonable suspicion'" that there may be criminal activity occurring. *Jewett v. Anders*, 521 F.3d 818, 823-25 (7th Cir. 2008) (quoting in part *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002) (stating that "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot") (internal quotations omitted) (quoting in part *Terry*, 392 U.S. at 30); *see also Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772 (1996) (indicating that even a temporary detention can be a seizure); *Valance v. Wisel*, 110 F.3d 1269, 1276 (7th Cir. 1997) (indicating that a *Terry* stop constitutes a seizure). A reasonable suspicion requires "more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Jewett*, 521 F.3d at 823-25 (quoting in part *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Determining whether an officer had a reasonable suspicion is assessed considering "the totality of the circumstances," and "'common-sensical judgments and inferences about human behavior.'" *Id.* (quoting in part

*United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005)). For an interaction to remain a valid *Terry* stop, the stop must be "limited in scope and executed through the least restrictive means reasonable. . . ." *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008); *see also United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (stating that a "proper *Terry* stop must be reasonable in scope and duration and officers are permitted to take reasonable steps to insure their own safety").

The officer who initially approached Gentry lacked any articulable facts at that point to justify a *Terry* stop. The officer was acting solely upon a general report of a "suspicious person," (App. at 1, 59), which did not provide any articulable facts that would suggest the person was committing a crime or was armed. In *United States v. Packer*, 15 F.3d 654 (7th Cir. 1994), this Court held that a report received by police officers of a "suspicious vehicle" in which four men were sitting was not sufficient to provide the officers with a reasonable suspicion to justify a *Terry* stop. *Id.* at 655. As in *Packer*, the officer who initially approached Gentry was not provided with sufficient information in the police dispatch to warrant a *Terry* stop. The dispatch did not indicate any specific facts concerning a crime and the general reference to a "suspicious person" was not sufficient to justify a *Terry* stop of Gentry. In *United States v. Lenoir*, 318 F.3d 725 (7th Cir. 2003), this Court held that a "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the

dispatch" and can justify a *Terry* stop. *Id.* at 729. However, in *Lenoir* the police dispatch referred to "a disturbance involving an unidentified male with a gun." *Id.* The officer that arrived on the scene in *Lenoir* was thus informed that the individual in question was involved in criminal activity and possessed a gun. In this case, however, the officer that approached Gentry was told nothing more than that the "suspicious person" was pushing a wheelbarrow, which is not a crime.

The undisputed record also makes clear that Gentry himself did not give the officers a reason to suspect that he had been engaged in any wrongdoing. The United States Supreme Court has recognized, for example, that "unprovoked flight" by a suspect can suggest wrongdoing. *See, e.g., Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676. The officer who initially approached Gentry testified that he saw Gentry "trotting," but did not testify that he saw Gentry attempt to flee upon being seen by the officers. When the officers pulled up in the patrol car, not only did Gentry not flee, to the contrary, he set down the wheelbarrow, waved to the officers and began walking towards them. The officer who initially approached Gentry also testified that although Gentry was carrying beer and public intoxication is a basis for an arrest, it did not appear that Gentry was intoxicated. There are no facts in the record concerning any action by Gentry or details regarding the area where Gentry was found that suggested that Gentry was engaged in wrongdoing or that Gentry posed a threat to the officers. Thus, when the officers arrived at the scene of the arrest they did not have any basis to form a reasonable suspicion necessary to conduct a *Terry* stop.

We recognize that working in law enforcement is a demanding profession, often requiring officers to make split-second decisions, which affect the safety of the public and the officers. *See Packer*, 15 F.3d at 659 (stating that police officers "regularly risk their lives in the interests of public safety, and yet at the same time they are required to justify their conduct" and acknowledging that "fine legal distinctions . . . are more readily made by a court, with the benefit of briefs and hindsight, than on the street where life and limb are at stake"). In the case before us, it should have been apparent to the officers that they had no basis to execute a *Terry* stop when they first observed Gentry. When the officers reached the scene and saw a person fitting the description of the "suspicious person," nothing prohibited them from approaching Gentry and observing Gentry on the public way while they asked Gentry questions. An officer can "approach[ ] individuals on the street or in other public places and put[ ] questions to them if they are willing to listen" and such conduct does not constitute a Fourth Amendment search and seizure. *United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, 2110 (2002); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324 (1983) (stating that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"). Thus, questioning Gentry on the public way

would not have "trigger[ed] Fourth Amendment scrutiny unless it los[t] its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991). While engaging in a consensual conversation with Gentry, the officers could have also asked for permission to search through the wheelbarrow without turning the interaction into a *Terry* stop. *See, e.g., id.* at 435, 2386 (stating that an officer could "request consent to search . . . luggage" without making the contact a *Terry* stop). If Gentry had consented to the search, he would not have had any basis for his motion to suppress. The officer's contact with Gentry was never consensual in nature, however, because the officer told Gentry to keep his hands up. The contact was further intrusive and non-consensual when the officer conducted the pat down on Gentry.

The officer testified that a pat down was "routinely" done "to make sure there's no weapons in [a suspect's] clothing." (App. at 63). While we recognize that officer safety is important, under the law, officers are not free to pat down citizens at will. A law enforcement officer can conduct a "protective pat-down search" during a *Terry* stop only if the officer has "at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the [officer] or others. . . ." *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001); *United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995) (recognizing that an officer is justified under *Terry* to "conduct a limited pat-down for weapons when specific articulable facts, as opposed to a mere inchoate and unparticularized suspicion or hunch, lead the officer to believe that the individual encountered is armed and

dangerous"). The officer who initially approached Gentry had no articulable suspicion that Gentry was armed and dangerous. *See, e.g., United States v. Brown*, 273 F.3d 747, 748-49 (7th Cir. 2001) (finding that facts such as the defendant's "movements in the car, his failure to produce a license, and his quick movement" justified "a limited patdown for weapons"). As previously discussed, Gentry did not attempt to flee or refuse to answer questions. There are no facts that would indicate that Gentry's demeanor or his actions indicated he was engaged in wrongdoing, much less that Gentry was a threat to the safety of the officers or the public. *See, e.g., United States v. Brewer*, 561 F.3d 676, 679 (7th Cir. 2009) (noting that the vehicle observed by officer "was the only vehicle on the road at that late hour in [a] high crime area"); *United States v. Hendricks*, 319 F.3d 993, 1002 (7th Cir. 2003) (finding reasonable suspicion based on the fact that the suspect was behind a closed commercial establishment and the officer had been aware of recent burglaries in the area); *Jackson*, 300 F.3d at 746 (stating that the evaluation of whether a stop was reasonable in scope can be based on "'the behavior and characteristics of the suspect'") (quoting *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995)). Thus, there were no facts known to the officers at the time of the pat down that would have given them reasonable suspicion that Gentry had committed a crime or articulable facts to suggest that Gentry was armed and dangerous. Although the officers ultimately uncovered Gentry's burglary and theft, such discoveries cannot be used in retrospect to justify the initial search. *See Brewer*, 561 F.3d at 678 (stating that "'[t]he reason-

ableness of official suspicion must be measured by what the officers knew before they conducted their search'") (quoting *Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)); *see also United States v. Griffin,* 589 F.3d 148, 154 n. 7 (4th Cir. 2009) (indicating that although a gun was recovered by the officer during a search of the vehicle in question, the discovery of the gun could not be relied upon "as justification for the search"). The officer who initially approached Gentry thus conducted the pat down and discovered the garage door opener without the requisite reasonable suspicion.

Even if the officer who searched Gentry had a basis to conduct a *Terry* stop and a pat down, the officer engaged in an unconstitutional seizure when he retrieved the garage door opener from Gentry's pocket and did not immediately return the garage door opener to Gentry. The officer testified that he felt a bulge in Gentry's clothing that "could have been a stun gun. . . ." (App. at 63). However, once the officer discovered that the item in Gentry's pocket was a garage door opener and not a weapon, he had no basis to seize or retain it, much less to drive off with it to investigate whether Gentry had committed crimes. *United States v. Place,* 462 U.S. 696, 716, 103 S.Ct. 2637, 2649 (1983) (stating that "[w]hile *Terry* may authorize seizures of personal effects incident to a lawful seizure of the person, nothing in the *Terry* line of cases authorizes the police to seize personal property, such as luggage, independent of the seizure of the person"). A garage door opener is an item that might commonly be found on a law-abiding person and does not suggest any wrongdoing. Thus, the officer

violated Gentry's Fourth Amendment rights during the initial stop, the pat down of Gentry, and the seizure of the garage door opener. We note that the Court of Appeals of Indiana agreed that the officer did not have a reasonable suspicion to justify the pat down of Gentry.

In addition to the search of Gentry, the officers proceeded to search through the contents of the wheelbarrow. The officer who initially approached Gentry testified that at one point during the initial contact with Gentry, the officer poked through the contents of the wheelbarrow. While one officer drove off to test the garage door opener, another officer engaged in a further search of the wheelbarrow and discovered items such as the toolbox and receipt. In determining whether a search is the type of search that is contemplated under the Fourth Amendment, the court should consider "whether the individual, by his conduct, has exhibited an actual expectation of privacy," and "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 1465 (2000) (internal quotations omitted) (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); *see also United States v. Sandoval-Vasquez*, 435 F.3d 739, 743 (7th Cir. 2006) (indicating that "[t]he touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy") (internal quotation omitted) (quoting *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)). The record reflects that Gentry placed a raincoat on top of the wheelbarrow partially covering

the items, which indicates some expectation of privacy with respect to the items in the wheelbarrow. In addition, to the extent that the record is not fully developed relating to Gentry's expectation of privacy, it is due to the fact that Gentry's counsel never moved to suppress the evidence obtained from the search of Gentry's person or the wheelbarrow. The basis of Gentry's habeas petition is his contention that his trial counsel did not file a motion to suppress evidence. Had Gentry's counsel filed a motion to suppress, Gentry would have had an opportunity to present evidence concerning his expectation of privacy.

Although the officers searched through the contents of the wheelbarrow, the officers did not have reasonable suspicion to believe Gentry had committed a crime until after the search when one of the officers had located Gill, using the garage door opener, and Gill identified items in the wheelbarrow as stolen items. The mere fact that the wheelbarrow did not have a closed lid does not mean that its contents could not be protected by the Fourth Amendment. The record indicates that the yellow raincoat placed on top of the wheelbarrow only partially covered its contents. However, the record also indicates that the visible items were not such that they provided the officers with a reasonable basis to conclude that Gentry had engaged in wrongdoing. Under the "plain-view" doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*,

508 U.S. 366, 374-75, 113 S.Ct. 2130, 2136-37 (1993). In the instant action, although some of the items on the top of the pile in the wheelbarrow were visible to the officers, the items did not indicate any wrongdoing on the part of Gentry. The facts do not indicate that the officers had reasonable suspicion or probable cause to search the wheelbarrow based on the items in plain view. There was no justification for a further warrantless search beneath the surface of the pile of items in the wheelbarrow. The officer who initially approached Gentry testified that Gentry was unable to give a consistent explanation for where he found the wheelbarrow. However, that alone would not justify a search of the wheelbarrow without a warrant. A reasonable suspicion could justify a limited *Terry* stop, and perhaps a limited detention of the wheelbarrow, if officers had reason to believe that it contained stolen items. *See, e.g., United States v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009) (indicating that in certain situations law enforcement can conduct a limited detention of luggage). A reasonable suspicion is not enough to justify a search of the wheelbarrow. To search the wheelbarrow, the officers needed probable cause and a warrant. The wheelbarrow also had the name "Brandt" spray painted on it, (App. at 4), which was visible to the officers, but there is nothing in the record that indicates that any of the officers at the scene were aware that there was a company in the area named Brandt Construction. (App. at 88). Nor does the fact that Gentry was "trotting" down a street at night, in and of itself, provide justification for the search of the wheelbarrow. (App. at 60). Gentry did not flee upon discovery and in fact turned and approached the

officers. The officers could not, for example, have searched without probable cause a shopping cart being pushed by Gentry down the street or a piece of luggage being carried by Gentry. *See, e.g., Place*, 462 U.S. at 706-07, 103 S.Ct. at 2644 (stating that the Court has "affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment"). The officers thus could not perform a search of the wheelbarrow incident to Gentry's arrest in this case without first obtaining a warrant and the record does not reflect any applicable exceptions to the warrant requirement. *See Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009) (stating that a court should begin assessing "a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions'") (quoting in part *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (stating that "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions"); *Lenoir*, 318 F.3d at 730 (stating that "warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant") (citing *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) and *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996)). The officers engaged in a warrantless search of the wheelbarrow and it was that

warrantless search that allowed the officers to find the receipt in the toolbox at the bottom of the wheelbarrow with Gill's name on it. Although, ultimately the officers were able to verify that the items in the wheelbarrow were stolen items, the officers were only able to obtain such evidence through unlawful searches. While we acknowledge the need by officers to conduct searches to investigate crimes and that, in this case, the officers' searches enabled them to tie Gentry to multiple unsolved crimes, officers must abide by constitutional standards when conducting such searches. Had the officers merely questioned Gentry instead of searching his person, obtained consent to search the wheelbarrow or properly obtained a search warrant for the wheelbarrow, the result in this case would have been different.

The Indiana Appellate Court on direct appeal concluded that the pat down by one of the officers was a violation of Gentry's Fourth Amendment rights. However, the Court further concluded that absent the pat down, the officers would still have discovered the identity of Gill through the discovery of the toolbox in the wheelbarrow. (App. at 156-57). Under the exclusionary rule, evidence seized in violation of the Fourth Amendment must be suppressed. *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009). The inevitable discovery doctrine provides an exception to the exclusionary rule, allowing the admission of evidence if "the government establishes by a preponderance of the evidence 'that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Alexander*, 573 F.3d 465, 477 (7th Cir. 2009) (quoting in part *Nix v.*

*Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). In the instant action, the garage door opener was obtained through an illegal search which led the officers to Gill. Based on the circumstances of the arrest and the items in plain view, the officers could not have discovered the toolbox but for the illegal searches. The Indiana Appellate Court's conclusion concerning the inevitable discovery doctrine was an unreasonable application of federal law to the facts in this case.

The exclusionary rule is not limited to the "primary evidence obtained as a direct result of an illegal search or seizure, but also [applies to] evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008) (internal quotations omitted) (quoting in part *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)); *see also United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) (stating that "[e]vidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint'") (quoting *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The officer who initially searched the wheelbarrow also searched Gentry's person, found the garage door opener, and left the area with the garage door opener to conduct further investigation. The further search of the wheelbarrow by another officer immediately followed the departure of the officer with the garage door opener. There is an absence of intervening circum-

stances leading to the search of the wheelbarrow by the second officer. Thus, the evidence discovered in the wheelbarrow by the second officer must also be excluded as fruit of the poisonous tree.

B. Ineffective Assistance of Counsel

Gentry's trial counsel in state court did not seek to suppress the evidence gained from the unconstitutional searches executed by the officers. Under the Sixth Amendment, a criminal defendant is provided with a right to effective assistance of counsel. *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (2009). In order to establish ineffective assistance of counsel, a petitioner must establish that: "(1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result." *Wyatt v. United States*, 574 F.3d 455, 457-58 (7th Cir. 2009) (citing *Strickland v. Washington,* 466 U.S. 668, 687-88, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see also Smith v. Spisak*, 130 S.Ct. 676, 684-85 (2010) (explaining the two prongs of the *Strickland* analysis). In regard to the performance of the attorney, a petitioner "must overcome the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Wyatt*, 574 F.3d at 457-58 (quoting in part *Strickland*, 466 U.S. at 687-88). In order to establish sufficient prejudice resulting from the deficiencies in a counsel's performance, a petitioner " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Porter v. McCollum*, 130 S.Ct. 447, 452

(2009) (quoting in part *Strickland,* 466 U.S. at 694); *see also Shell*, 448 F.3d at 955 (stating that "'[w]hen the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious'") (quoting *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)).

As explained above, the record reflects that the searches performed by the officers at the scene of Gentry's arrest were unconstitutional and there is thus no indication that a motion to suppress evidence resulting from such searches would have been futile. *See A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) (stating that "[i]f there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion"). We recognize that trial strategies are generally left to the discretion of counsel and second-guessing strategic decisions in hindsight will generally not be a meritorious basis to find ineffective assistance of counsel. *See, e.g., Smith v. Gaetz*, 565 F.3d 346, 352-53 (7th Cir. 2009). However, in this case, the decision by Gentry's trial counsel not to seek to suppress evidence based on a violation of Gentry's Fourth Amendment rights is beyond the pale of an objectively reasonable strategy. The application of the fundamental principles of Fourth Amendment case law to Gentry's situation should have been apparent to his trial counsel. The record does not indicate that any strategic benefit would have been accorded to Gentry by his trial counsel's failure to seek the suppression of the evidence. Gentry even brought the suppression issue to the atten-

tion of his counsel by filing a *pro se* motion to suppress and yet, even then, his counsel failed to attempt to suppress the evidence. Gentry has shown that he received ineffective assistance of counsel and that he suffered prejudice. The record does not reflect what evidence could have been used to convict Gentry excluding the garage door opener, the identities of the residents, the stolen items and the evidence found in the wheelbarrow. We conclude that the Court of Appeals of Indiana unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) to the facts in this case.

At oral argument, Respondent also made a cursory argument that Gentry forfeited his claim concerning ineffective assistance of counsel as to the search of the wheelbarrow because Gentry never properly raised it before. The record, however, reflects that while Gentry's state trial and appellate counsel did not raise the claim relating to suppression, Gentry himself raised this claim, *pro se*, during state court proceedings. In addition, Gentry raised the claim of ineffective assistance of counsel as to the search of the wheelbarrow in his opening brief in this Court, and Respondent did not include the forfeiture argument in its appellee brief. The Respondent's forfeiture argument is thus waived. *See, e.g., Awe v. Ashcroft*, 324 F.3d 509, 512-13 (7th Cir. 2003).

### III. Conclusion

For the above stated reasons, we conclude that the Court of Appeals of Indiana unreasonably applied federal law when the Court determined that the

evidence concerning the search of the wheelbarrow was admissible and held that Gentry's counsel's performance did not fall below an objective standard of reasonableness. We REVERSE the decision of the district court and REMAND with instructions to GRANT the petitioner's request for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. If the State elects not to retry Gentry within 120 days, he shall be released from confinement.