In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 18-1935

MARCUS D. TORRY, LATRELL Q. GOSS,
and WILLIAM I. ROBERTS,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-8383 — **John Robert Blakey**, *Judge*.

---

ARGUED APRIL 9, 2019 — DECIDED AUGUST 2, 2019

---

Before KANNE, BARRETT, and BRENNAN, *Circuit Judges*.

BARRETT, *Circuit Judge*. One afternoon in 2014, three Chicago police officers stopped three black men in a grey sedan to investigate a nearby shooting that had happened a few hours earlier. When the passengers sued the officers a year later, none of the officers remembered the *Terry* stop. Lacking recall, they relied on other evidence to show that reasonable suspicion had existed for it. Cell phone footage taken by one

of the plaintiffs during the encounter depicted Sergeant Robert King, the officer who initiated the stop, citing the plaintiffs' suspicious behavior in the area of the shooting as the reason that he had pulled them over. And a police report showed that dispatches to officers investigating the shooting, including King, identified the suspects as three black men in a grey car. The descriptions of the car's model varied, and none was an exact match for the car that the plaintiffs were driving. But reasonable suspicion can exist without an exact match, and the district court held that these descriptions were close enough to justify the *Terry* stop. In any event, the court said, the officers were entitled to qualified immunity because the stop did not violate clearly established law.

Before us, the plaintiffs have repeatedly suggested that the defendants' failure of memory is a concession of liability. In other words, they maintain that if a police officer doesn't remember a stop now, reasonable suspicion could not have justified it at the time. But the Fourth Amendment does not govern *how* an officer proves that he had reasonable suspicion for a *Terry* stop; he can rely on evidence other than his memory to establish what he knew when the stop occurred. The police report demonstrates that King knew that the suspects in the shooting had been identified as three black men driving a grey car, and the cell-phone video shows him giving the shooting as the reason for the stop. We agree with the district court that the officers are entitled to qualified immunity.

## I.

On the morning of September 23, 2014, a drive-by shooting occurred about half a mile from Manley High School, which is located on West Polk Street in Chicago. Sergeant Robert King was on duty that day as a "school sergeant"—an

officer who responds to and investigates violence near schools within his beat. A police report detailing the chronology of events related to the shooting shows that King responded to the shooting and that three descriptions of suspects were received while he was assisting.[1] One identified the suspects' vehicle as a newer-model grey Nissan with three black male occupants. The second was almost identical to the first but specified that the Nissan was an SUV. The third identified the shooter as a medium-complected black male wearing a white t-shirt and driving a grey Trailblazer (a Chevrolet SUV).

Shortly past noon on that same day, Marcus Torry and William Roberts picked up Latrell Goss, Torry's brother, in a grey Ford Fusion sedan. Goss's car had broken down on West Polk Street; Torry and Roberts met him at his car and then drove him west on West Polk to an auto parts store. They passed Manley High School as they drove to the store, and they passed it again when they returned the same way. As they went by the school for the second time, they were pulled over by three police officers—King, Jacek Leja, and Justin Raether. Torry captured video of the ensuing encounter on his cell phone camera. Like the district court, we draw our de-

---

[1] This report is from the Office of Emergency Management and Communications and is called a "Chicago Police Department Event Query Report." For simplicity's sake, we will refer to it as a "police report." The record also contains post-dated supplementary reports that expand on the information contained in the police report. The parties dispute the admissibility of these supplementary reports, but because they are not necessary to show that King knew about the shooting and suspect descriptions, we do not address them.

scription of the encounter primarily from the video, supplementing it with other undisputed facts and drawing all inferences in the plaintiffs' favor.[2]

After Torry pulled over, King approached his window and asked for his license and registration. Torry asked why he had been stopped, and King replied that "this was about your third pass by this school." Torry protested that he had not driven by the school three times and handed over his license and registration. King told him not to argue; Torry demanded King's badge number.

King told Torry to step out of the car and reached for the handle of the driver's door, which prompted Torry to ask if he was under arrest. King didn't directly answer the question but said, "Sir, get out of the car please. Sir, this is a *Terry* stop, I have the right to search the car, get out of the car." Torry, protesting that he had done nothing wrong, failed to comply with multiple commands that he exit the vehicle. King told Torry, "If you don't get out of the car, I will remove you from the car," and Torry replied, "I'm gonna remove myself but I just don't want to get—y'all get me, shoot me, or kill me for something I didn't do wrong." King responded, "Yes, sir, absolutely; hands up, don't shoot, there you go." Neither King nor the other officers had a gun out, but Torry feared police brutality.

Torry testified that when he finally removed his seatbelt, King "just grab[bed] me out of the car." King ordered Torry to "come on out, sir," as Torry repeatedly exclaimed, "Please

---

[2] Neither side contests the admissibility of the video, which the plaintiffs and defendants introduced as a joint exhibit in the district court. The video runs the full length of the stop.

don't shoot." King walked Torry to a squad car, saying, "Let's go back to my car, sir, right over here," and placed him inside. Goss testified that an officer grabbed him out of the car too, but neither Goss nor Roberts were placed in a squad car. After the plaintiffs had been repeatedly ordered to leave the car but before they had complied, one of the officers shook a can of mace, although he never used it.

After placing Torry in the back of his squad car, King sat in the front for a few minutes while he ran Torry's name through a warrant check. Torry demanded to know why he had been pulled over, and King explained that Torry had "cruised this street here around the school," which was an area of "safe passage" and "the immediate location of a shooting this morning." (An area of "safe passage" is a designated area where extra precautions are taken to prevent violence that might affect students on their way to and from school.) King then returned to Torry's car, where the officers talked to Goss and Roberts, who testified that the other officers patted them down and searched Goss's pockets. Still in the squad car, Torry yelled obscenities and protests while continuing to film with his cell phone camera. At one point, Goss approached the car and told him to be quiet, to which Torry responded, "Leave me alone!"

Roughly ten minutes into the stop and eight minutes after putting Torry in the squad car, King retrieved Torry and walked him back to his own car. Torry asked if he was under arrest, to which King answered, "If you were under arrest, you'd be in handcuffs." Torry got in his car, and King returned his license and registration. Shortly after, one of the officers said to Goss that "you don't want anything to do with him," and—in response to an unintelligible reply—said,

"Yeah, c'mon, jump in the car … yeah we'll give you a ride home." Goss testified that the officers had told him to get in their car to return to his disabled car.

Free to leave, Torry and Roberts pulled back onto West Polk Street. Torry continued his video recording, narrating that the officers were driving behind his car. Goss, riding in the back seat of Leja and Raether's car, testified that those officers debated pulling Torry over again "to mess with him." But the officers dropped Goss off at his car and nothing else happened.

One year later, Torry, Goss, and Roberts sued the three officers under 42 U.S.C. § 1983, alleging that the officers lacked reasonable suspicion to initiate the *Terry* stop, and that even if the stop was justified, its scope transformed it into a de facto arrest without probable cause.[3] By the time the plaintiffs filed suit, none of the officers could recall the stop. Nor could King recall any details about the shooting. It was undisputed, though, that the shooting occurred while King was on duty in that area as a school sergeant, and the police report detailing the investigation's chronology reflected that King responded as an assist vehicle to the shooting, drove around the corner to the victim's residence a few minutes later, and continued to assist until 9:49 a.m., when the report notes him as "clear." During the hour or so that King was on the shot call, three suspect descriptions were transmitted to investigators: one that identified the suspects' car as a newer-model grey Nissan with three black male occupants, a second

---

[3] The plaintiffs voluntarily dismissed other claims that they had asserted against the officers.

that was almost identical to the first but specified that the Nissan was an SUV,[4] and a third that identified the shooter as a medium-complected black male wearing a white t-shirt and driving a grey Trailblazer.

Based on that report and his review of Torry's video, King testified by affidavit that the dispatches would have alerted him that the suspects were three black men driving a grey car, and, as the video reflected, that he told Torry—who was driving a grey car with three black male occupants—that he had stopped him because of the shooting. The plaintiffs and the defendants filed cross-motions for summary judgment, and the district court granted summary judgment to the defendants.

## II.

The primary theme of the plaintiffs' argument is that proving reasonable suspicion for the stop requires the officers to have at least some independent memory of what they knew at the time. The plaintiffs particularly object, therefore, to the district court's reliance on indirect evidence—the police report and King's affidavit—to conclude that the officers had reasonable suspicion to pull them over. They offer four reasons why the district court was wrong to consider this evidence: first, the officers submitted it in response to the plaintiffs' motion for summary judgment rather than in support of

---

[4] This second entry lacks a timestamp and so may have been received later. But because identifying the car as an SUV weakens the officers' argument for reasonable suspicion and because we must take the facts in the light most favorable to the plaintiffs, we presume that this description had been received by the time of the stop. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

their own motion; second, King's affidavit was a sham because it contradicted his prior testimony; third, the police report was hearsay; and fourth, King's lack of memory precludes him from relying on the collective knowledge doctrine. None of these arguments succeeds.

To begin with, it doesn't matter that the officers submitted the report and affidavit in their response to the plaintiffs' motion for summary judgment rather than in support of their own motion. In adjudicating a motion for summary judgment, "[a] court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). The court was therefore free to consider evidence submitted in response to one motion when it decided the other. Indeed, it would have been odd for the court to ignore the report and affidavit, because they were obviously relevant to the defendants' cross-motion on the very same issues. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) ("Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered."). The plaintiffs had an opportunity to—and did—address the evidence in their own brief, and they don't suggest that they were inappropriately prejudiced by its consideration. *Cf. Simpson v. Merchs. Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999) (explaining that summary judgment may be granted sua sponte "so long as the opposing party has had an adequate opportunity to respond." (citation omitted)). This argument for excluding the report and affidavit fails.

The plaintiffs' next argument—that the court should have excluded King's affidavit as a sham—fares no better. According to the plaintiffs, King made several admissions during

discovery that effectively conceded his liability, and his affidavit contradicts these admissions because it explains why King had reasonable suspicion for the stop. Thus, they insist, the court was obliged to exclude the affidavit as a sham. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). The premise of the plaintiffs' argument is flawed, however, because King's affidavit does not contradict his prior admissions. King never conceded that he stopped the plaintiffs unlawfully; he stated that he had no independent memory of the incident. Admitting to a lack of memory is a far cry from admitting that the opposing party's version of events is correct. *See Brown v. County of Cook*, 661 F.3d 333, 338 (7th Cir. 2011). Rather than contradicting his prior admissions, King's affidavit explained the newly introduced police report and how it bore on the stop. The district court did not abuse its "great discretion" by considering King's testimony. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999); *cf. Bank of Illinois*, 75 F.3d at 1172 (approving consideration of even contradictory affidavits if based on new evidence).

The plaintiffs' next argument—that the police report was inadmissible hearsay—is their most underdeveloped. They insist that the report is hearsay, but they never articulate why any of the statements within the report was offered as proof of the truth of the matter asserted. *See* FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that … a party offers in evidence to prove the truth of the matter asserted in the statement."). Their failure to develop this argument is enough to dispense with it. *See Mathews v. REV Recreation Grp., Inc.*, No. 18-1982, 2019 WL 3369563, at *3 n.2 (7th Cir. July 26, 2019). We

observe, however, that many of the statements were obviously not offered for their truth. For example, the descriptions of the shooters (three black men) and their vehicle (a grey Nissan, a grey Trailblazer, or a grey Nissan SUV) were not offered to show what the real shooters looked like or what car they were actually driving. The descriptions were offered to show that a competent officer aware of that information could conclude that there was reasonable suspicion to stop Torry and his passengers. *See Woods v. City of Chicago*, 234 F.3d 979, 986–87 (7th Cir. 2000) (a statement in a police report is not hearsay if it is offered "to show the effect that the statements had on the officers" who heard it); *id.* at 987 (explaining that the Fourth Amendment analysis does not turn on whether the information in the tips turns out to be true). Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay. *See* 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:20 (4th ed. 2013).

We will assume for the sake of argument that the entries reflecting King's response to the shooting were offered for their truth.[5] Even if they were, however, the plaintiffs don't

---

[5] It is doubtful, though, that even these statements are hearsay. The fact that King was participating in the investigation is implicit in the entries describing his response to the shot call, but that is not what the declarant was intentionally trying to convey. Assertions often reflect a declarant's underlying assumptions, but only the assertions themselves meet Rule 801's definition of hearsay. *See* FED. R. EVID. 801(1) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion*." (emphasis added)); *see also* 4 MUELLER & KIRKPATRICK, *supra*, § 8:24. *United States v. Zenni* is the classic example. *See* 492 F. Supp. 464, 469 (E.D. Ky. 1980) (callers placing bets did

counter the defendants' argument that the entire report is admissible under the business records exception. *See* FED. R. EVID. 803(6). That exception applies if five conditions are met: (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge"; (2) "the record was kept in the ordinary course of a regularly conducted activity of a business, organization, occupation, or calling"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of a custodian or another qualified witness"; and (5) "the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* The only factor that the plaintiffs come close to discussing is the fourth: they seem to argue that King was not qualified to authenticate the report because he could not remember receiving the transmissions that it recorded. But to authenticate a business record, a qualified witness "need not be in control of or have individual knowledge of the particular [] records"; he "need only be familiar with the [] recordkeeping practices." *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) (citation omitted). In his affidavit, King testified that each of the conditions was satisfied. Plaintiffs have not argued otherwise. Because the report is a business record, all of its statements are admissible for their truth.[6]

---

not intend to assert that they were telephoning a betting establishment, so the statements were not hearsay when offered for that purpose).

[6] It is true that any statements in the report made by those outside of the police force constitute "hearsay within hearsay" and would need to be themselves justified by a hearsay exception. The plaintiffs do not identify any such statements in the report, so they have forfeited any argument for

The plaintiffs point out that while the police report shows that descriptions of the suspects were transmitted to investigators, it does not expressly note whether the investigators received them. The district court properly concluded, though, that we can impute that knowledge to King via the collective knowledge doctrine. "[W]hen officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992); *see also United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). That is true even when the communication is by dispatch rather than face-to-face. *See Sawyer*, 224 F.3d at 680. King's presence at and involvement in the shooting investigation—bolstered by his testimony that suspect descriptions are typically shared with officers at the scene and through the Office of Emergency Management and Communications—are enough to attribute the knowledge to him.

Because the report establishes that King was aware of both the shooting and the suspect descriptions, the court appropriately treated those as undisputed facts when considering whether reasonable suspicion for the *Terry* stop existed.

---

their exclusion. For the sake of completeness, however, we note that the most obvious candidates are the witnesses' descriptions of the shooters. As we have already explained, they were not offered for their truth. Even if they had been, though, they would have been admissible as present-sense impressions. *See* FED. R. EVID. 803(1) (defining a present sense impression as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it").

III.

That brings us to the reasonableness of the stop. The plaintiffs argue that it violated the Fourth Amendment, given that the shooting had occurred several hours earlier and that Torry's car was a different model than the one identified in the department's transmissions to investigators. The defendants contend that the stop was lawful and that they are in any event entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (citation omitted). Thus, to win, the plaintiffs must show not only that the stop was unlawful, but also that the unlawfulness of the stop was clearly established at the time that it occurred. Because the plaintiffs cannot make the latter showing, we need not consider whether the stop violated the Fourth Amendment. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[C]ourts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first ….").

The "demanding standard" that the law be "clearly established" for liability to attach "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For the law to be "clearly established," existing precedent must have placed the unlawfulness of the stop "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). It is usually necessary to identify an instance in which "an officer acting under similar circumstances

… was held to have violated the Fourth Amendment," though in the "rare 'obvious case'" the violation may be sufficiently clear "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (alteration in original) (citations omitted).

The general rule established by *Terry v. Ohio* is that officers may conduct a brief investigatory stop if they reasonably suspect that an individual has committed or is about to commit a crime. 392 U.S. 1, 20–22 (1968). Reasonable suspicion is a lower standard than probable cause. *See Navarette v. California*, 572 U.S. 393, 397 (2014). It's a "commonsense, nontechnical [standard] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citation omitted). It is judged holistically, based on "the sum of all of the information known to officers at the time of the stop." *See Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014).

The plaintiffs do not contend that this is the rare case in which the facts establish a blatant violation of *Terry*'s rule even though there is no case on point. *See Wesby*, 138 S. Ct. at 590. Instead, they identify two cases that they say clearly established the illegality of this *Terry* stop: *Gentry v. Sevier*, 597 F.3d 838 (7th Cir. 2010), and *United States v. Packer*, 15 F.3d 654 (7th Cir. 1994). In *Gentry*, a police officer stopped someone after hearing a dispatch report that a suspicious person was pushing a wheelbarrow. 597 F.3d at 842–43. In *Packer*, police officers stopped a vehicle's occupants based on a citizen's report that a suspicious vehicle was parked along the street at one o'clock in the morning. 15 F.3d at 658. Neither report provided any facts concerning any crime that the people stopped

were suspected of committing—they were stopped just because they looked suspicious. In both cases, therefore, the officers "lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct." *Green v. Newport*, 868 F.3d 629, 634 (7th Cir. 2017) (citation omitted).

Neither *Gentry* nor *Packer* speaks to a situation like this one, where the plaintiffs partially matched the description of suspects involved in a drive-by shooting. When the officers in this case stopped the plaintiffs, they knew that three black men in a grey car were suspected of committing a nearby shooting earlier that day. The plaintiffs matched this description in number, race, and car color. *Cf. United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch."). The plaintiffs argue that the reasonableness of the officers' suspicion was nevertheless undermined in two ways: first, the descriptions that the officers relied on identified the suspects' vehicle as an SUV, but the plaintiffs were in a sedan; and second, the shooting occurred too far away (half a mile) and too long before (four hours) to justify the stop. But while these discrepancies may weigh against the officers' suspicion, they don't clearly overcome it.

We'll begin with the variation between Torry's car and the descriptions of the suspects' car. Under our precedent, an imperfect match between a suspect and a description does not necessarily make an officer's suspicion unreasonable. *See, e.g.,*

*D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (finding reasonable suspicion to stop an individual "who somewhat matched the description of the suspect"). And the significance of the imperfect match may have been lessened here because there were multiple reports giving conflicting information about the suspects' grey car. One report identified it as a Nissan, without giving a model; another identified it as a Nissan SUV; and a third identified it as a Trailblazer (an SUV made by Chevrolet). The fact that the reports' descriptions of the car were consistent only as to its grey color gave the officers some reason to pay more attention to the color than to the make or model. No clearly established law holds that this kind of variation makes an officer's suspicion unreasonable under the Fourth Amendment.

As for the time and place discrepancies, past cases have not established that they're enough to defeat reasonable suspicion. In *United States v. Tilmon*, for example, we found a stop reasonable based on the "match of a unique automobile with a driver fitting the general description of the bank robber," even though the stop occurred two hours after and fifty miles away from the robbery. 19 F.3d 1221, 1225 (7th Cir. 1994). This stop occurred four hours after but only a half-mile away from the shooting and within the "safe passage" area surrounding Manley High School.

Finally, the officers' suspicion was not based solely on the descriptions of the suspects. The plaintiffs had also passed by the same area multiple times, behavior that could suggest that they were casing it in preparation for further criminal activity related to the dispute underlying the shooting. *Cf. Green*, 868 F.3d at 634 (circling an auto parts store's parking lot multiple

times near the close of business contributed to an officer's reasonable suspicion). Taking all of this evidence together, a reasonable officer could have concluded that the investigative *Terry* stop of the plaintiffs comported with the Fourth Amendment. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

IV.

Finally, the plaintiffs argue that even if the stop was initially justified, it exceeded its appropriate bounds and turned into a de facto arrest. They argue that taking Torry's identification and placing him in the back of the squad car was more intrusive than was warranted for the *Terry* stop, and thus transformed the encounter into an arrest without probable cause.

The district court concluded both that the scope of the stop was lawful and that the officers were entitled to qualified immunity regardless. The plaintiffs challenge only one of those holdings: the lawfulness of the stop. Because they do not challenge the district court's alternative holding that the defendants are entitled to qualified immunity, they have forfeited this argument. *See United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (emphasis omitted)). We note, however, that our precedent on the permissible scope of a *Terry* stop would have made this a tough argument for the plaintiffs to win. In *United States v. Bullock*, for example, we held that a defendant being handcuffed, placed in a squad car, and transported back to a house that he had recently left didn't transform a *Terry* stop into an arrest. *See*

632 F.3d 1004, 1016 (7th Cir. 2011). We specifically noted that because the officers suspected that the defendant was selling drugs—a crime "associated with dangerous and violent behavior"—detention in the squad car was a reasonable precaution. *Id.* In the face of decisions like *Bullock*, the plaintiffs in this case would have a difficult time showing that detaining a drive-by shooting suspect in a squad car for approximately eight minutes clearly rose to the level of a formal arrest requiring probable cause under the law at that time.

* * *

Because the defendants are entitled to qualified immunity, the judgment of the district court is AFFIRMED.