In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 19-2373

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIN F. GRAHAM, JR.,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:18CR00043-001 — **James D. Peterson**, *Chief Judge.*

———————————

ARGUED NOVEMBER 16, 2020 — DECIDED AUGUST 29, 2022

———————————

Before SYKES, *Chief Judge*, and EASTERBROOK and WOOD, *Circuit Judges*.

SYKES, *Chief Judge*. A grand jury indicted Erin "Sonny" Graham for conspiracy to commit sex trafficking and six related crimes stemming from his operation of an interstate commercial-sex enterprise in central Wisconsin. About a year before he was indicted, police in Grand Chute, Wisconsin, were called to a local motel to break up a fight between Graham and his coconspirator Patience Moore. During that encounter, the officers' body cameras captured Moore in an

agitated state shouting that Graham was prostituting young women and was holding and prostituting a 19-year-old in a room at the motel.

The government played the body-camera recordings at Graham's trial during an officer's testimony. By then Moore had pleaded guilty and was on the government's witness list, though it was uncertain whether the prosecutor would actually call her to testify. Later in the trial, Graham's attorney moved for a mistrial, arguing that if Moore did not testify, Graham would be denied his Sixth Amendment right to confront her about the statements in the bodycam recordings. *See generally Crawford v. Washington*, 541 U.S. 36 (2004). The government later clarified that it would not call Moore as a witness.

Ruling on the mistrial motion, the district judge agreed with Graham's attorney that a Confrontation Clause violation had occurred but declined to grant a mistrial. He concluded that a curative instruction was adequate to remedy any prejudice and therefore instructed the jury to disregard Moore's statements in the bodycam video. The jury found Graham guilty on all counts. On appeal he challenges the denial of his mistrial motion.

We affirm, but on somewhat different reasoning. There was no Confrontation Clause violation. Moore uttered her statements spontaneously as the officers were responding to a fight in progress and to rapidly evolving circumstances suggesting that sex trafficking might be occurring at the motel. When statements are made to law-enforcement officers under circumstances objectively indicating that the primary purpose of the police encounter is to respond to an ongoing emergency, the statements are not testimonial and thus do not implicate the Confrontation Clause. That is the

case here. And even if a confrontation violation had occurred, it was harmless.

## I. Background

Graham ran a commercial sex business in and around Madison, Wisconsin, from approximately October 2015 until about May 2017 when he was arrested. He was charged by superseding indictment with seven crimes: conspiracy to commit sex trafficking, 18 U.S.C. §§ 1591, 1594(c); three counts of sex trafficking by force, threat, or coercion, *id.* § 1591(a)(1); one count of attempted sex trafficking by force, threat, or coercion, *id.*; and two counts of interstate transportation of a person to engage in commercial sex, *id.* § 2421.

Moore, who assisted Graham in his prostitution business, was named as a codefendant in four of these charges: conspiracy to commit sex trafficking and three of the sex-trafficking crimes. She eventually pleaded guilty to the conspiracy count. In exchange the government dropped the remaining charges against her.

The case against Graham proceeded to trial, and Moore was listed as a potential government witness. The charges against Graham centered on his actions relating to four victims: Cinderria, Krystle, Cynthia, and Kelsey. They testified that Graham used drugs, violence, and various forms of psychological coercion to force them to engage in sex acts on "dates" with paying customers who responded to his advertisements on backpage.com. Graham did not deny his involvement in a commercial-sex enterprise involving these women; the crux of his defense was that he did not use force or coercion.

The mistrial decision—the only issue on appeal—largely concerns the evidence relating to Cinderria, so we limit our

discussion accordingly. Cinderria testified that she met Graham and Moore at a shopping mall when she was 18 and had just moved to Wisconsin. Graham promised her an apartment, a car, and a 50/50 split of the earnings if she agreed to perform commercial sex acts with his customers. Soon after she began to engage in commercial sex "dates" at Graham's direction, but he withheld her share of the earnings and became violent if she did not comply with his demands. She testified that Graham choked and beat her, pulled her hair, and on one occasion left her by the side of a road in freezing weather. He also blackmailed her by threatening to tell her family that she was a prostitute. When she said she did not want to perform "dates," Graham and Moore tracked her location via cell phone. They used similar coercive tactics, threats, and violence against the other victims.

In May 2016 Graham and Moore had an explosive argument in a motel room at a Red Roof Inn in Grand Chute, Wisconsin. Cinderria was present; she testified that Graham got violently angry when Moore tried to wake him up. They argued, and as the fight continued, Moore nudged Graham's face. Graham then threw Moore into the bathroom, and Cinderria heard sounds of a beating. Moore was bleeding heavily when she emerged from the bathroom. The fight then moved into the motel parking lot, where Moore continued to scream at Graham. When she began to throw rocks at him, bystanders called the police.

When officers arrived on the scene, they attempted to arrest Moore. She resisted, so they called for backup and tried to calm her down. But she remained extremely agitated and continued to resist arrest. Officer Travis Waas responded to the call for backup, and the officers managed to handcuff

Moore. Graham, however, was not arrested. Instead, Officer Waas accompanied him back to his room in the motel.

Much of the police encounter with Moore in the motel parking lot was captured by the officers' body cameras. At trial the government played excerpts of the bodycam footage during Officer Waas's testimony. The first excerpt showed Moore handcuffed in the parking lot while Graham was on the upstairs balcony. Moore was extremely agitated, and the officers were trying to calm her down. She identified Graham by name and yelled, "He got a 19-year-old prostitute! And he took me from New York … . [H]e took me all the way from fucking New York." An officer asked if Graham was pimping her. She answered, "[H]e pimp[ed] me for a fucking year and a half[,] … worst year and a half of my life."

The prosecutor questioned Officer Waas about Moore's statements in the video:

> GOVERNMENT: Did she say something about her face?
>
> OFFICER WAAS: Yes. That [Graham] had scratched her face.
>
> GOVERNMENT: Did she say, "He put a mark on my face"?
>
> OFFICER WAAS: Uh-huh, yes.
>
> …
>
> GOVERNMENT: So when this is going on, where are you, and what are you doing?
>
> OFFICER WAAS: Before this had happened, I had walked with Mr. Graham up to the balcony to grab his ID from the hotel room. … I

walked inside. There were two other females inside the room. …

GOVERNMENT: And do you know the approximate age of the females?

OFFICER WAAS: I believe one looked younger, maybe 19 years old. …

In the next excerpt, Officer Waas is seen talking to Graham near and in his motel room. Cinderria appears in the background, though only briefly, and Moore's screaming from the parking lot below was audible on the recording. Officer Waas testified that Moore was yelling about Graham prostituting women.

The final excerpt is actually the prequel to the other two, but the government played it last. It showed another officer attempting to arrest Moore before Officer Waas arrived on the scene. Moore shouted to the officers, "He's over here prostituting bitches. He kidnapped me from fucking New York."

As we've noted, the police did not arrest Graham in connection with the incident at the Red Roof Inn. Cinderria testified that he continued to traffic her for another year. She tried to leave in April 2017, but Graham assaulted and choked her in a hotel room until she blacked out. She managed to escape and alert a hotel employee who called 911. This time Graham was arrested.

As the government continued to present its case, Graham's attorney alerted the court to a potential Confrontation Clause problem: if the government decided not to call Moore as a witness, then Graham would be deprived of his right to confront her about her statements to the police at the Red Roof Inn as captured in the bodycam videos. The gov-

ernment replied that the videos raised no Confrontation Clause concerns because Moore's statements were nonhearsay utterances offered to show their effect on Cinderria rather than the truth of the matters asserted. The videos, the government argued, were offered merely to reinforce Cinderria's testimony that she was fearful of what would happen to her if she tried to leave Graham and Moore.

It remained uncertain whether the government would call Moore as a witness, so the judge deferred consideration of the Confrontation Clause question. But he acknowledged the dilemma and expressed some skepticism about the government's argument that Moore's statements were not hearsay. His preliminary view was that Moore's statements on the videos were probably testimonial hearsay, so their admission would violate Graham's right of confrontation unless she testified and was subject to cross-examination. Still, the judge did not "see [her statements] as all that damning." He said he would be inclined to simply instruct the jury to disregard them if she did not testify.

The next day the government announced that it would not call Moore as a witness. At that point Graham's attorney moved for a mistrial, reiterating his Confrontation Clause objection. The judge denied the motion, explaining that a mistrial was unnecessary. He agreed with the defense that because Moore did not testify, the admission of her recorded statements violated Graham's right of confrontation. But the judge determined that a curative instruction directing the jury to disregard the statements would adequately address any prejudice to Graham.

The judge then instructed the jury as follows:

Yesterday, we watched a video in which Patience Moore made statements during an incident at the hotel in Grand Chute. We have now been informed that Ms. Moore will not be testifying. Accordingly, you can't consider anything that Ms. Moore said in that video because Ms. Moore can't be cross-examined about those statements. You can consider the video itself and statements made by other participants. This instruction is specific to the video that we saw yesterday, and it doesn't relate to your consideration of any other evidence or testimony in the case.

The jury convicted Graham on all counts, and the judge imposed a sentence of 300 months in prison.

## II. Discussion

Graham limits his appeal to the denial of his mistrial motion. Evidentiary rulings implicating a defendant's Sixth Amendment right to confrontation are reviewed de novo. *United States v. Burgos*, 539 F.3d 641, 643 (7th Cir. 2008). We review the denial of the mistrial motion for abuse of discretion. *United States v. Marchan*, 935 F.3d 540, 546 (7th Cir. 2019).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. CONST. amend. VI. As the Supreme Court held in *Crawford*, the Clause bars the admission of "testimonial statements of a witness who [does] not appear at trial unless he [i]s unavailable to testify[] and the defendant … had a prior opportunity for cross-examination." 541 U.S. at 53–54.

The phrase "testimonial statements" is a "critical portion" of *Crawford*'s holding. *Davis v. Washington*, 547 U.S. 813, 821 (2006).

> Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to the traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

*Id.* (citation omitted).

Whether the Confrontation Clause bars the admission of out-of-court testimonial statements of a nontestifying witness depends on how the prosecution uses the statements at trial. A testimonial statement is inadmissible "only if it is admitted for its truth," i.e., if the statement is hearsay. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016). The Confrontation Clause has no role to play in the admissibility of nonhearsay—"testimonial statements [admitted] for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9.

We begin with the common ground: the parties agree that Moore was both available to testify and that Graham did not have a prior opportunity to cross-examine her. The defense, of course, was not required to call Moore as a witness. "[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Graham was under no obligation to remedy the Confronta-

tion Clause dilemma created by the government's decision not to call Moore as a witness.

The government argues here, as it did in the district court, that Moore's recorded statements were not hearsay because they were offered to show the effect on Cinderria and not the truth of what Moore asserted. If the government is wrong about this—if Moore's statements were indeed hearsay—then we must decide whether they were testimonial within the meaning of the Supreme Court's confrontation jurisprudence. *See United States v. Amaya*, 828 F.3d 518, 528 (7th Cir. 2016). The government argues that Moore's statements were not testimonial—and even if they were, their admission was harmless error.

## A. Moore's Statements Were Hearsay

An out-of-court statement is hearsay if it is offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c)(2). "[S]tatements introduced to show their effect on the listener" are not offered to prove the truth of the matter asserted and therefore are not hearsay. *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019). A statement is offered to show an effect on the listener only if the listener heard and reacted to the statement, *United States v. Gaytan*, 649 F.3d 573, 579–80 (7th Cir. 2011), and if the "actual use" of the statement at trial was to demonstrate the listener's response, *Jones v. Basinger*, 635 F.3d 1030, 1042 n.2 (7th Cir. 2011).

The government argues that Moore's statements were not hearsay because they were offered for the purpose of showing their effect on Cinderria—i.e., the statements corroborated her testimony that she feared that Graham would resort to violence against her if she tried to leave. But

the government did not actually use Moore's statements in that way. The prosecutor made no effort to connect Moore's statements as captured in the bodycam video to Cinderria's state of mind. Officer Waas was not asked about Cinderria's reaction (if any). Nor was Cinderria asked about how the statements, or the incident more generally, affected her. The government's use of Moore's statements was not so circumscribed as it claims.

We're left, then, with a broader and open-ended evidentiary purpose for admitting Moore's statements, one that invited the jury to accept as true her accusations that Graham was prostituting young women, including Cinderria. Moore, hysterical, blurted out that Graham was prostituting young women and had "a 19-year-old prostitute" in his room at the motel. Cinderria was briefly visible in Graham's room in one of the bodycam excerpts, and Officer Waas testified that he saw two young women—including one who was about 19 years old—in the room. The officer also described an online advertisement for a prostitute dated the same day as the incident at the Red Roof Inn. In short, we agree with the district judge that Moore's statements in the bodycam videos were hearsay.

## B.  Moore's Statements Were Not Testimonial

The next question is whether Moore's statements were testimonial. The inquiry focuses on the "primary purpose" of the police encounter in which they were made. *Ohio v. Clark*, 576 U.S. 237, 244 (2015). The Supreme Court distinguishes between police encounters that enable officers to respond to ongoing emergencies and interrogations aimed at establishing past events:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

Whether "an emergency exists … is a highly context-dependent inquiry." *Michigan v. Bryant*, 562 U.S. 344, 363 (2011). The Supreme Court has, however, determined that an ongoing emergency exists when a dangerous individual is on the loose and poses a "bona fide physical threat" to others. *Davis*, 547 U.S. at 827. In *Davis* a woman called 911 and reported that her ex-boyfriend, whom she identified by name, was "jumpin' on me again" and "usin' his fists." *Id.* at 817. The Court held that the admission of the 911 call at the ex-boyfriend's trial did not violate the Confrontation Clause because the woman "was speaking about events *as they were actually happening*, rather than describing past events." *Id.* at 827 (cleaned up). The woman "simply was not acting as a *witness*; she was not *testifying*." *Id.* at 828 (quotation marks omitted). Instead, the primary purpose of her statements was to report and explain an ongoing emergency to police officers and to seek their help in ending the emergency.

In *Bryant* the Court reaffirmed these principles. There, police officers responded to a 3:25 a.m. dispatch about a shooting and spoke to the victim when they arrived. He had

a gunshot wound to the abdomen and was in great pain, but he was able to tell them that he was shot at about 3 a.m. by a man named "Rick"—an acquaintance later identified as Richard Bryant—through the back door of Rick's house. The prosecution introduced the victim's statement to the police at Bryant's murder trial. The Court held that the victim's statement was nontestimonial because its primary purpose was "to enable police assistance to meet an ongoing emergency"—namely, an armed shooter with an unknown motive had fled the scene and remained at large. *Bryant*, 562 U.S. at 349 (quoting *Davis*, 547 U.S. at 822).

This case falls on the nontestimonial side of the line as explained in *Davis* and *Bryant*. Moore's statements to the police were made spontaneously and under circumstances objectively indicating that the officers' primary purpose was to resolve the ongoing emergency of a fight in progress and sex trafficking occurring at the motel. Moore identified a dangerous individual and described his crime as it was actually happening. She told the officers that Graham presently had "a 19-year-old prostitute" in his room at the motel and was "prostituting bitches." The primary purpose of this police encounter was to enable the officers to respond to unfolding events—i.e., to report ongoing sex trafficking at the motel, rescue the victim, and apprehend the perpetrator.

Graham's argument to the contrary is unpersuasive. He relies on *Hammon v. Indiana*, 547 U.S. 1213 (2006), a case consolidated with *Davis*. In *Hammon* police responded to a reported domestic disturbance, separated the victim from the perpetrator, and interviewed the victim, who made statements regarding the disturbance. The Supreme Court determined that the victim's statements were testimonial because the ongoing emergency of domestic violence had

ended. The victim and perpetrator had been separated, and police were in control of the situation.

*Hammon* is distinguishable. The *Hammon* victim described a past assault, whereas Moore described a present, ongoing criminal act. As *Bryant* makes clear, a statement is more likely to be nontestimonial when it describes dangerous criminal activity that is "*actually happening*." 562 U.S. at 356. Additionally, police had neutralized the *Hammon* perpetrator by separating him from his victim. But police had not yet neutralized Graham at the time Moore made her statements. Indeed, Graham and his victim Cinderria remained in the motel room, and Graham continued to traffic her for another year. Moore's statements were nontestimonial hearsay, so their admission at trial did not violate Graham's Sixth Amendment confrontation right.

Even if a Confrontation Clause error occurred, we're satisfied that it was harmless. In this context harmless-error analysis "depends upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, … and the overall strength of the prosecution's case." *United States v. Walker*, 673 F.3d 649, 658 (7th Cir. 2012) (quotation marks omitted). A Confrontation Clause violation is not harmless if these factors indicate to "the average juror" that without the wrongfully admitted testimony, "the prosecution's case would have been significantly less persuasive." *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1998) (quotation marks omitted).

The government's case against Graham was very strong. He was convicted under § 1591(a), which prohibits the use of force or coercion "to cause [a] person to engage in a commercial sex act," and also § 2421, which prohibits transport-

ing a person in interstate commerce "with intent that [the person] engage in prostitution." By his own testimony, Graham admitted that he prostituted multiple women; he denied only that he used force or coercion to do so. Moore's outbursts as recorded in the bodycam videos simply confirmed what Graham conceded. Cinderria and the other victims testified that Graham used physical force, including choking, hair-pulling, pushing, punching, and forced restraint. They also testified about Graham's coercive tactics, like withholding money and using illegal drugs as a means of control.

Moore's statements were therefore both cumulative and of limited evidentiary value. Her identification of Graham as having a "19-year-old prostitute" and her other references to "pimping" merely parroted Graham's concessions at trial. Likewise, her statements contained little, if any, information about force or coercion. In light of the other victims' graphic and damning testimony, Moore's statements were of minimal importance to the government's case.

AFFIRMED