**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14116
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ANTHONY BERNARD CARTER,

*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20052-DPG-1
_____

_____

No. 23-10776
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ANTHONY BERNARD CARTER,

*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20052-DPG-1

_____

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

KIDD, Circuit Judge:

Anthony Bernard Carter is a self-described pimp who transported two victims from Atlanta to Miami to perform sex work in advance of the 2020 Super Bowl. He raises several challenges to his four convictions for sex-trafficking offenses. First, he argues that the admission of the minor victim's statements made during a sting operation violated the Sixth Amendment's Confrontation Clause and the rule against hearsay because the minor victim did not testify at trial. He also argues that the jury instructions for two of the offenses constructively amended the superseding indictment in violation of the Fifth Amendment. Finally, he questions the sufficiency of the evidence the government presented on two of the counts. We disagree with Carter on each issue and affirm his convictions.

## I.    BACKGROUND

A grand jury indicted Carter on four sex-trafficking offenses for conduct involving two victims, Adult Victim and Minor Victim (like the trial court, we use these pseudonyms to preserve the victims' anonymity). These four counts included: (1) sex trafficking of Adult Victim by force and coercion, in violation of 18 U.S.C. § 1591; (2) transporting Adult Victim to engage in sexual activity, in violation of 18 U.S.C. § 2421(a); (3) sex trafficking of Minor Victim, in violation of 18 U.S.C. § 1591; and (4) transporting Minor Victim to engage in sexual activity, in violation of 18 U.S.C. § 2423(a). A superseding indictment charged Carter with the same four offenses. Carter proceeded to trial, which lasted four days. The parties adduced the following evidence at trial.

### A.  *Carter Is a Self-Avowed Pimp Who Facilitated the Sex Work of the Victims.*

Carter referred to himself as a "pimp" on social media and posted about forcing women to engage in sex work on his behalf. His social media activity featured the hashtag "#pimpquotes," and Instagram messages promised employment in an adult-entertainment club to facilitate sex work. The government presented evidence to establish that commercial sex work—synonymous with prostitution—is generally illegal.

Carter's social media accounts featured pictures and videos of Carter with Adult Victim and Minor Victim. Adult Victim testified at trial, but Minor Victim did not testify. Adult Victim

explained that she met Carter while visiting and performing sex work in Atlanta. Carter posed as a customer and threatened her into verbally accepting him as her pimp. Fearing for her safety, Adult Victim gave Carter the $800 that she had on her, then she fled after saying that she needed to collect her belongings. She blocked Carter's number and ignored his subsequent attempts to contact her.

Carter later deceived her into meeting by posing as a new client; he threatened Adult Victim and her friends with violence if she did not immediately accept him as her pimp, which she did. Carter then drove her to a motel room and forced her to have sex with him. He arranged employment for her in an adult-entertainment club.

One night, Carter picked up Adult Victim after work and took her to live with Minor Victim in a hotel room, where Minor Victim was performing sex work for Carter. Minor Victim was seventeen at the time. Carter knew that Minor Victim was under the age of eighteen. At Carter's behest, Minor Victim taught Adult Victim how to solicit customers in bars for sex work. Adult Victim performed sex work for Carter in Atlanta. Carter was "always around" when Adult Victim was with Minor Victim.

When Adult Victim began working for Carter, he took control of her iPhone for his own use and linked his Instagram account to that phone. The government introduced several message exchanges between the Victims and Carter using Adult Victim's

iPhone and Carter's black flip phone. Carter saved a contact for the flip phone in Adult Victim's iPhone as "Daddy."

### B. *Carter and the Victims Traveled to Miami in Advance of the Super Bowl.*

According to Adult Victim, it was "slow" in Atlanta in January 2020 because there "was no money to be made" from sex work. For this reason, Carter informed the Victims that the three of them would travel to Miami in advance of the Super Bowl the following month. Carter drove the Victims to Miami in Adult Victim's black Toyota Corolla with Texas license plates. Carter intended for Adult Victim to work at an adult-entertainment club in Miami. He asked a contact at that club whether it would hire Adult Victim and informed the contact, "I'm basically coming out there just to get her hired." He prohibited Minor Victim from seeking work at the club. Despite this, Carter told Victims on the ride to "go to sleep" because "when [they] got there[, they] were going to work." Upon their arrival in Miami, the club did not hire Adult Victim.

Video from Carter's social media showed the three of them at a rental unit together shortly after arriving in Miami. "Within the first day," Adult Victim and Minor Victim went on a sex date with a customer. Carter "told [them] that [they] had a date" from "an ad" that he had posted on a website, MegaPersonals, in advance of their trip. The advertisement, titled "Sweet Double Trouble," featured the Victims in sexual poses, showed the Victims performing sexual acts on each other, and described Minor Victim as a "one in a million experience."

While the Victims were at the sex date, Carter informed his Miami contact that he was "letting them keep the car to catch some big plays." On that date, the Victims both had sex with the customer for $1,200 and drugs, all of which they gave to Carter. Adult Victim had another sex date with that customer the next day, and when she returned to the rental unit, Carter and Minor Victim were leaving "because Minor Victim had a date." Carter took Adult Victim's car and iPhone when departing with Minor Victim.

### C. *Minor Victim's Sex Date Was Part of a Police Sting Operation.*

Minor Victim's next sex date was actually part of a sting operation that the Miami Beach police arranged to combat commercial sex work surrounding the Super Bowl. When scouring the internet for potential sex ads, the police found the "Sweet Double Trouble" advertisement. Sergeant Laurence Villa responded to the advertisement and arranged a sex date for the night of January 22, 2020, at a hotel room reserved for the sting operation. Sergeant Villa received a call that evening from a female speaker telling him that she would be there soon. He also overheard a male voice in the background instructing the female speaker to confirm that the purported customer (Sergeant Villa) was not a police officer.

Sergeant Villa testified that Minor Victim seemed "very insecure and unsure" when she arrived at the hotel room, but she collected the money from him and instructed him to put on a condom. After exchanging the money, Sergeant Villa gave a signal, and other officers entered the room from the hallway. When this

happened, Sergeant Villa testified that Minor Victim "began to throw like a temper tantrum, she broke down in tears, she was extremely emotional, bawling, crying." In short, she "seemed like a girl not . . . in control of her emotions" and "was not able to just follow basic instructions to calm down, just relax."

Carter objected—based on hearsay and the Confrontation Clause—to two statements that Minor Victim made after the officers appeared at the sting. The district court overruled the objections. Thereafter, Sergeant Villa recounted the statements. First, "within the first 30 seconds" of the officers entering the room, Minor Victim exclaimed that she "did not even want to come on th[e] date and that she was forced to." She made this statement without police questioning. After this, officers attempted to calm her and to explain that she was not their ultimate target, in part "to investigate further." But Minor Victim was "talking over" the officers, pointing to the black flip phone that she had brought to the hotel room. She told them, "Look, you can see my phone. I don't want to get anybody in trouble."

The officers opened the phone and saw that it had an open message thread. The last message received was an order to "[g]et extra for your daddy." Subsequent analysis showed that this message came from Adult Victim's iPhone and that the black flip phone that Minor Victim had at the sting was the one that called Sergeant Villa before Minor Victim arrived at the sting.

The officers knew that the sex date was supposed to last only an hour, so they reviewed the hotel's security cameras and found

footage of a black Toyota Corolla with Texas license plates dropping off Minor Victim. After Sergeant Villa messaged "[d]one" in reply to the open message on the phone, the other number replied that it would come "in four minutes." Around that time, officers saw the same car arrive and wait where it had dropped off Minor Victim.

The other number called the flip phone, and Sergeant Villa saw the driver raise a phone to his ear. Sergeant Villa answered and heard a male voice ask for Minor Victim's location. At Sergeant Villa's signal, two uniformed officers approached the car. One of the officers, Detective Carlos Corvo, testified that he shined his flashlight inside the car and identified Carter as the driver. The driver ignored an order to open the door and fled at high speed.

Officers found the car two-and-a-half blocks away without a driver—it had crashed into concrete barriers. Inside, officers found Adult Victim's iPhone; driver licenses belonging to Adult Victim, Carter, and another woman; women's clothing; a condom box; receipts; and other items. Police found Carter's fingerprints on various items in the car and on the driver area of the car's interior.

### D. *After the Sting Operation, Carter and Adult Victim Returned to Atlanta.*

Adult Victim testified that she fell asleep after Carter and Minor Victim left the rental unit on the night of January 22, 2020. She awoke to "banging at the door," and Carter told her, "We got to go." She described Carter as "[v]ery frantic and . . . panicky." Minor Victim was not with him. The pair fled to a motel, where Carter

told her that the date with Minor Victim had been a sting. Adult Victim never recovered her car, iPhone, or driver license.

Adult Victim accompanied Carter back to Atlanta on a Greyhound bus. Carter arranged for Adult Victim to work at a new adult-entertainment club in Atlanta, where Adult Victim regularly engaged in sex work for Carter. She later escaped from Carter and returned to Texas. In total, she engaged in sex work roughly seventy times on Carter's behalf.

### E. *The Jury Convicted Carter on All Counts.*

Following the presentation of evidence, the district court discussed its proposed jury instructions with the parties. Relevant to this appeal, the court asked the defense whether it objected to the instruction for Count 2 (transporting Adult Victim to engage in sexual activity). The defense responded: "So that was the one that I had seen that was recently amended on the Southern District's website, but—this is fine, no objection." For Count 4 (transporting Minor Victim to engage in sexual activity), the defense objected to using pseudonyms for the Victims, which the court overruled. After rejecting this concern, the court asked if the defense had any other objection. The defense responded: "No, I just think privacy reasons are—you know, they're not—they're moot at this p[o]int." Finally, after instructing the jury, the court asked both sides whether they had any objections to the instructions as read, and the defense assured the court, "No, Your Honor, they're perfect . . . ."

After deliberating for less than an hour, the jury convicted Carter on all four counts. The district court sentenced Carter to 300 months of imprisonment along with ten years of supervised release to follow his imprisonment. The district court noted that restitution would be proper but was not yet calculable. Carter filed his first notice of appeal on December 12, 2022. After the district court entered a restitution order and amended the judgment, Carter filed another notice of appeal.

Carter raises identical issues in the consolidated cases. He challenges (1) the admission of Minor Victim's two statements to officers during the sting as violations of the Confrontation Clause and the rule against hearsay; (2) the alleged constructive amendment of his indictments for Counts 2 and 4; and (3) the sufficiency of the evidence supporting his convictions for Counts 2 and 4.

## II.    STANDARD OF REVIEW

We review de novo whether a statement implicates the Sixth Amendment's Confrontation Clause. *United States v. Melgen*, 967 F.3d 1250, 1260 (11th Cir. 2020). We review evidentiary rulings—including hearsay decisions like those for excited utterances—for an abuse of discretion. *See United States v. Belfast*, 611 F.3d 783, 816–18 (11th Cir. 2010). An abuse of discretion occurs with an erroneous legal determination or a clearly erroneous factual assessment. *Id.* Hearsay errors are subject to harmless error review. *United States v. Carter*, 776 F.3d 1309, 1328 (11th Cir. 2015).

We analyze de novo the constructive amendment of an indictment. *United States v. Gray*, 94 F.4th 1267, 1270 (11th Cir. 2024).

If the defendant fails to object to proposed jury instructions before the district court, we review constructive amendments only for plain error. *United States v. Dennis*, 237 F.3d 1295, 1299 (11th Cir. 2001).

We consider de novo the sufficiency of evidence to support a conviction, viewing all evidence and drawing all inferences in the light most favorable to the government. *United States v. Al Jaberi*, 97 F.4th 1310, 1322 (11th Cir. 2024). If "a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt," we will not disturb a conviction. *Id.* (citation modified).

## III.    DISCUSSION

We address the issues on appeal sequentially. First, we consider whether the district court improperly admitted the statements of Minor Victim at the sting. Second, we analyze whether the jury instructions constructively amended Carter's indictment on Counts 2 and 4 and, if so, whether it was plain error. Third, we evaluate the sufficiency of the evidence adduced in support of those two counts. Ultimately, we reject Carter's arguments on each issue.

### A.    *The District Court Did Not Reversibly Err by Admitting Minor Victim's Statements Made at the Sting.*

Upon learning that her ostensible sex date was part of a sting operation, Minor Victim stated that she "did not even want to come on th[e] date and that she was forced to [be there]," and she

offered, "Look, you can see my phone. I don't want to get anybody in trouble." The district court concluded that the statements were not testimonial, so they did not implicate the Confrontation Clause. *See* U.S. CONST. amend. VI. It also held that they were excited utterances excepted from the rule against hearsay. *See* Fed. R. Evid. 803(2). Carter challenges both determinations. We find no reversible error.

> 1.  The Statements Were Nontestimonial, so
>      the Confrontation Clause Did Not Attach.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." This "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). The Supreme Court has articulated a "primary purpose" test for evaluating whether a statement is testimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past

events potentially relevant to later criminal prosecu-
tion.

*Id.* at 244 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

Courts must evaluate "all of the relevant circumstances" to determine whether a statement is testimonial. *Id.* (quoting *Michigan v. Bryant*, 562 U.S. 344, 369 (2011)). Information volunteered without police questioning may be testimonial, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 316 (2009), while "not all those questioned by the police are witnesses and not all interrogations by law enforcement officers are subject to the Confrontation Clause," *Bryant*, 562 U.S. at 355 (citation modified).

The presence of an ongoing emergency is not required to make a statement nontestimonial, but it is an important consideration. *See Clark*, 576 U.S. at 244. Accordingly, courts look to whether there is a threat to a victim, to the police, or to the public. *See Bryant*, 562 U.S. at 363. Other considerations include whether the declarant was in police custody at the time of the statement, the temporal proximity between the statement and the referenced event, and the deliberateness of any police questioning. *See id.* at 377; *Davis*, 547 U.S. at 827, 830.

Beyond the presence of an ongoing emergency, factors that suggest that a statement is nontestimonial include whether the statement was prompted by police questioning and whether the declarant was distressed when making the statement. *See United States v. Arnold*, 486 F.3d 177, 190 (6th Cir. 2007) (en banc) (finding

that the unprompted nature of the statement and the victim's "distress" both "suggest[ed] that the statement was nontestimonial").

Turning to the present case, we conclude that the district court did not abuse its discretion in determining that Minor Victim's statements were nontestimonial because they came in response to an ongoing emergency.

The Supreme Court's guidance in *Clark* is instructive. In *Clark*, the Supreme Court considered whether a three-year-old child's statement to teachers implicating his mother's boyfriend (and pimp) as his abuser was testimonial. *See* 576 U.S. at 240–41. After the child arrived at school with visible injuries, his teachers asked him how he had been hurt. *Id.* at 241. After initially saying that he fell, the child eventually named his abuser. *Id.* The Supreme Court concluded that the statements were nontestimonial due to the existence of an ongoing emergency. *Id.* at 246–47.

First, the *Clark* Court emphasized that the "teachers were not sure who had abused him or how best to secure his safety" or whether "any other children might be at risk." *Id.* at 247. In this way, the continuing threat to the child, to other potential victims, and to the public supported finding an ongoing emergency. *See id.*

In this case, the officers did not know the identity of Minor Victim's trafficker or how many others were at risk at the time of the sting. Notably, the officers identified the trafficking based on the "Sweet Double Trouble" advertisement, which showed at least one other victim (Adult Victim) not present at the sting. Sergeant Villa also heard a male voice on the call he received before Minor

Victim arrived at the sting, suggesting the presence of an at-large trafficker.

Second, to that point, the Supreme Court heavily weighted the fact that the child's abuser was not in police custody when the child gave the statement. *See id.* at 246–47. With an at-large abuser, the teachers' questions "were meant to identify the abuser in order to protect the victim from future attacks." *Id.* at 247. So, too, in this case. Carter remained free and a potential threat to Minor Victim and unknown other victims at the time of the sting operation.

Third, *Clark* highlighted the possibility of ongoing criminal behavior. The Supreme Court reasoned that the teachers' "immediate concern was to protect a vulnerable child who needed help," and the fact that they "thought that this would be done by apprehending the abuser or by some other means *is irrelevant*." *Id.* (emphasis added). That the child was away from his abuser and ostensibly safe with the teachers when giving the statement did not render the statement testimonial. *See id.* In other words, a minor victim's temporary safety does not necessarily end an ongoing emergency when an at-large perpetrator has the ability to continue the criminal conduct. *See Bryant*, 562 U.S. at 363 ("An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.").

In this case, the police informed Minor Victim that their immediate concern was to protect her. That she was separated from

Carter and in police custody at the time of the statements did not eliminate the ongoing threat that Carter posed to her and to others. *See id.* at 363–64. We therefore conclude that Minor Victim's statements came in the context of an ongoing emergency presented by a continuing sex-trafficking operation with an at-large trafficker and at least one other known victim.

The Seventh Circuit reached the same conclusion in a factually similar case. In *United States v. Graham*, officers were called to a motel to break up a fight between the declarant and the defendant, and the declarant remained "extremely agitated." 47 F.4th 561, 563–65 (7th Cir. 2022). During and after her arrest, the declarant made multiple statements to the police implicating the defendant as a pimp who had a nineteen-year-old sex worker in another room at the motel. *See id.* at 564–65.

The Seventh Circuit found no Confrontation Clause violation because the declarant "uttered her statements spontaneously as the officers were responding to a fight in progress *and to rapidly evolving circumstances suggesting that sex trafficking might be occurring at the motel.*" *Id.* at 563 (emphasis added). It determined that this constituted an ongoing emergency, as the primary purpose of the statements was to "enable the officers to respond to unfolding events—i.e., to report ongoing sex trafficking at the motel, rescue the victim, and apprehend the perpetrator." *Id.* at 569. The declarant "identified a dangerous individual and described his crime as it was actually happening." *Id.*

The same reasoning applies here. Carter's sex trafficking presented an "unfolding [event]" representing an ongoing emergency that did not end when Minor Victim entered police custody. *Id.* at 569. From the "Sweet Double Trouble" advertisement, officers knew of at least one additional victim—and Minor Victim herself knew of Carter's control over Adult Victim. This constituted "rapidly evolving circumstances suggesting that sex trafficking might be occurring," with the statements "identif[ying] a dangerous individual and describ[ing] his crime as it was actually happening." *Id.* at 563, 569.

Factors beyond the presence of an ongoing emergency also suggest that the statements were nontestimonial. Minor Victim offered the first statement within "the first 30 seconds" of the officers entering the room and made the second while "talking over" the officers. This shows a lack of a formal interrogation. *See Bryant*, 562 U.S. at 377; *Clark*, 576 U.S. at 247. Additionally, Sergeant Villa described Minor Victim as throwing "a temper tantrum": "she broke down in tears, she was extremely emotional, bawling, crying," she "seemed like a girl not . . . in control of her emotions," and she "was not able to just follow basic instructions to calm down, just relax." Minor Victim's distress further undermines Carter's assertion that the statements were testimonial. *See Arnold*, 486 F.3d at 190.

Carter quotes this Court's language from *United States v. Arbolaez* that "statements taken by police officers in the course of interrogations are *definitively* testimonial," and he argues that the

quotation is conclusive on these facts. 450 F.3d 1283, 1291 (11th Cir. 2006) (citation modified). We disagree. To the extent that the holdings of this Court conflict with subsequent Supreme Court precedent, the Supreme Court's analysis controls. *United States v. Mendez*, 528 F.3d 811, 817 n.3 (11th Cir. 2008). And the Supreme Court has held that "not all those questioned by the police are witnesses and not all interrogations by law enforcement officers are subject to the Confrontation Clause," directly contradicting the statement from *Arbolaez*. *Bryant*, 562 U.S. at 355 (citation modified).

Carter next highlights Sergeant Villa's testimony that he attempted to calm Minor Victim "to investigate further" as evidence that the officers were functioning in an investigative capacity and that the statements were testimonial. While this testimony does support Carter's argument, courts look objectively at the context in which the police and the declarant made the statements. *Id*. at 367. Objectively, Sergeant Villa's testimony as a whole indicates that the statements were not prompted by police questioning and came while Minor Victim was emotionally distressed. His subjective purpose at any given moment does not govern our conclusion.

Carter also argues that the government forfeited reliance on any ongoing-emergency argument by not raising it before the district court. Although the government did not explicitly argue the presence of an ongoing emergency, the district court did not request substantive argument from the government on the Confrontation Clause issue when it was discussed at trial. Given the nature of the Confrontation Clause objection, the district court necessarily

considered the presence of an ongoing emergency when denying Carter's objection. *See id.* at 361 ("The existence of an ongoing emergency at the time of an encounter between an individual and the police is among the most important circumstances informing the primary purpose of an interrogation." (citation modified)).

In summary, we conclude that Minor Victim's statements to the police were made in response to an ongoing emergency. Due to the ongoing emergency and the other relevant circumstances, the statements were nontestimonial. Because the Confrontation Clause's protections did not attach to the statements, their admission did not violate Carter's rights under the Sixth Amendment.

2. Even If the Statements Were Not Excited
Utterances, Their Admission Was Harm-
less.

Moving beyond the Confrontation Clause, Carter contends that the district court abused its discretion by admitting Minor Victim's statements as excited utterances. *See* Fed. R. Evid. 803(2) (excepting from the rule against hearsay "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). The government disagrees and argues, alternatively, that any error was harmless. We agree on the latter point and find that, even if the statements were erroneously admitted, any error was harmless.

"Hearsay errors are harmless if, viewing the proceedings in their entirety, a [reviewing] court determines that the error did not affect the verdict, or had but very slight effect." *Carter*, 776 F.3d at

1328 (citation modified). Key considerations include the amount of evidence against the defendant and the importance of the improperly adduced evidence to the charged offenses. *See id.*

The government presented a mountain of evidence against Carter, and the government correctly notes that neither of the challenged statements was crucial to its case. To review, Minor Victim stated that she "did not even want to come on th[e] date and that she was forced to [be there]," and offered, "Look, you can see my phone. I don't want to get anybody in trouble." Neither statement concerns Adult Victim, so they were not essential to Count 1 (sex trafficking of Adult Victim by force and coercion) or Count 2 (transporting Adult Victim to engage in sexual activity).

Nor were the statements necessary to the charges involving Minor Victim. Carter focuses on the fact that the jury instructions for Count 3 (sex trafficking of Minor Victim) unnecessarily included a definition for coercion. While Minor Victim's first statement could indicate that Carter coerced her into attending the sting sex date, Carter concedes that coercion was not necessary to finding liability for Count 3, and the jury instructions for Count 3 made this clear. The statements also evidence Carter's knowledge that Minor Victim was engaging in commercial sex work, which is relevant to Counts 3 and 4. But given the substantial amount of other evidence of this knowledge, Minor Victim's statements were not essential to prove this point.

The government's reference to the statements as part of the "Gold Standard evidence" in its rebuttal closing argument does not

disturb this conclusion. The government preceded any discussion of Minor Victim's statements by informing the jury that, if it believed Adult Victim's testimony, it did not need to consult any other evidence. The government then listed several pieces of additional evidence—including Minor Victim's statements, officers seeing Carter in the black Toyota Corolla in the hotel parking lot, and the presence of Carter's fingerprints, his driver license, and Adult Victim's iPhone in the crashed car—and informed the jury that those facts were "just the Gold Standard evidence." The government did not focus exclusively on Minor Victim's statements or single them out as fundamental to its case; rather, it discussed the statements as part of the extensive evidence supporting Carter's conviction beyond Adult Victim's testimony.

Given the strength of the case against Carter and the fact that Minor Victim's statements were not crucial to any of the counts, we conclude that any error from the admission of Minor Victim's statements would be harmless.

B. *The Constructive Amendments of Counts 2 and 4*
*Were Not Plain Errors.*

The Fifth Amendment's grand-jury requirement prevents the government from trying a defendant "'on charges that are not made in the indictment against him.'" *United States v. Madden*, 733 F.3d 1314, 1317–18 (11th Cir. 2013) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)); *see* U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand

Jury . . . ."). If an essential element of a charged offense is broadened beyond the indictment—as we sometimes see through argument and instructions to a jury at trial—then a constructive amendment occurs. *United States v. Baldwin*, 774 F.3d 711, 724 (11th Cir. 2014).

Constructive amendments mandate reversal when the defendant properly objects to them. *See Gray*, 94 F.4th at 1270. But if the defendant fails to object before the district court, this Court reviews constructive amendments only for plain error. *Dennis*, 237 F.3d at 1299.

Carter argues on appeal that the jury instructions constructively amended Counts 2 and 4. The government admits that parts of each instruction were erroneous but notes that Carter did not object to the errors at trial. Indeed, the government argues that Carter invited the errors by explicitly agreeing with the proposed instructions before the court read them to the jury. But we need not consider whether Carter invited the errors because we find that, on the merits, they do not warrant reversal. *Cf. United States v. Burnette*, 65 F.4th 591, 600–01 (11th Cir. 2023) (explaining that this Court has "traditionally construed invited errors narrowly, so as to preserve the opportunity for appellate review in close cases").

### 1. The Jury Instructions Constructively Amended Counts 2 and 4.

Carter alleges that the district court constructively amended Counts 2 and 4.

In Count 2, the superseding indictment charged Carter with the transportation of Adult Victim in interstate commerce "with the intent that [she] engage in prostitution," in violation of 18 U.S.C. § 2421(a). The district court explained that one of the elements of this offense was that Carter "intended that [Adult Victim] would engage in prostitution," which it defined as having the same meaning as "commercial sex act." It defined "commercial sex act" as "any sex act on account of which anything of value is given to or received by any person." Carter takes no issue with any of this.

The district court then instructed the jury that it need not determine that Carter's sole purpose in transporting Adult Victim was for her to engage in prostitution because it "is enough that one of the dominant purposes was prostitution or debauchery." The "or debauchery" portion of the instruction was neither part of the indictment nor part of the statutory scheme at the time of indictment. *See* 18 U.S.C. § 2421(a). The government concedes that this instruction was given in error.

For Count 4, the superseding indictment charged Carter with knowingly transporting Minor Victim in interstate commerce "with the intent that [she] engage in any sexual activity for which any person can be charged with a criminal offense," in violation of 18 U.S.C. § 2423(a). He argues that the jury instructions constructively amended his indictment in three ways.

First, the court instructed that a conviction under Count 4 required finding that Carter "intended that the individual named in

the superseding indictment would engage in prostitution." He contends that prostitution is an alternative means of violating § 2423(a), resulting in a constructive amendment of his indictment. But as the government correctly notes, Florida criminalizes "prostitution," making it a sexual activity for which a person can be charged with a criminal offense. Fla. Stat. § 796.07. Indeed, the jury instruction restricting the type of criminal sexual activity to "prostitution" likely *limited* Carter's liability. We find no constructive amendment on this basis.

Second, when defining "prostitution" as used in the jury instructions for Count 4, the district court used a different definition than for Count 2, defining it as "engaging in or agreeing or offering to engage in any lewd act with or for another person in exchange for money or other consideration." Carter correctly explains that "any lewd act" is more encompassing than either "prostitution" or "any sexual activity for which any person can be charged with a criminal offense," resulting in a constructive amendment. The government concedes error with this instruction.

Third, Carter argues that the jury instructions failed to instruct the jury on the state law criminalizing the "sexual activity" at issue. We have previously found that it is "best practice" for the district court to do so. *United States v. Doak*, 47 F.4th 1340, 1353 (11th Cir. 2022). But we have found no error despite the failure to instruct on state law when "the indictment was detailed enough to notify the [defendants] of the charges against them." *Id.* (analyzing an indictment under 18 U.S.C. § 2423(a)). Each of the other three

counts concerned commercial sex acts, and the jury heard direct testimony that commercial sex and prostitution were illegal.

Thus, we find that only the jury instructions' usage of "debauchery" with Count 2 and "any lewd act" with Count 4 constituted constructive amendments. Because Carter failed to object to the instructions, we review them for plain error. *See Dennis*, 237 F.3d at 1299.

### 2. The Constructive Amendments Were Not Plain Errors.

Plain error occurs if a party can show "(1) error; (2) that is plain; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Al Jaberi*, 97 F.4th at 1322 (citation modified). This Court has held that a constructive amendment satisfies the first two prongs. *See Madden*, 733 F.3d at 1322–23.

The primary question is whether either of the constructive amendments affected Carter's substantial rights. This prong requires the defendant to show that the error "was probably responsible for an incorrect verdict." *United States v. Iriele*, 977 F.3d 1155, 1179 (11th Cir. 2020) (citation omitted). In making that assessment, the overarching consideration is whether the entire record suggests that it is "likely that the jury would have convicted" the defendant without the error. *Burnette*, 65 F.4th at 603. "If the defendant's guilt would have been clear under the correct instruction, he loses under the substantial rights third prong of plain error review . . . ." *Iriele*, 977 F.3d at 1179.

We conclude that the jury likely would have convicted Carter on both Count 2 and Count 4 even without the errors in the jury instructions. Again, we emphasize the substantial amount of evidence introduced at trial. There was specific evidence that Carter facilitated Victims' participation in commercial sex work. So there is little reason to believe that the jury convicted Carter on Count 2 because it thought his dominant purpose in transporting Adult Victim to Miami was that she engage in "debauchery" instead of "prostitution." Likewise, the jury heard evidence that Carter facilitated Minor Victim's commercial sex work—not some undefined "lewd acts." The substantial evidence against Carter shows that the jury likely would have convicted him without the errors.

On that point, we observe that the jury convicted Carter on Counts 1 and 3. Those counts required the jury to find that Carter "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], or maintain[ed]" Adult Victim and Minor Victim, respectively, "knowing" or "in reckless disregard of the fact" that they would be forced to "engage in a commercial sex act." Count 2 defined "[p]rostitution" as having "the same meaning as the term 'commercial sex act.'" Carter agrees that this was the proper definition for "prostitution." So the jury determined that Carter both knew of and facilitated the commercial sex work of the Victims— in other words, "prostitution," not "debauchery" or "lewd acts."

We also consider the government's theory of its case and the arguments that it made at the close of the case. *See id.*; *United States*

*v. Leon*, 841 F.3d 1187, 1195 (11th Cir. 2016). The government's theory remained consistent throughout trial: Carter was a pimp who forced the Victims to perform sex work on his behalf and transported them to Miami to continue this practice. The government referenced Carter's role as a pimp and the Victims' sex work repeatedly during its closing argument.

Considering all that was before the jury, there is little indication that the errors led to an incorrect verdict. *See Iriele*, 977 F.3d at 1178 ("When we apply the plain error rule to jury instructions, we do not consider the asserted errors in isolation. Instead we consider the totality of the charge as a whole and determine whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error." (citation modified)). We therefore conclude that the erroneous jury instructions did not affect Carter's substantial rights.

Because the constructive amendments did not constitute plain error, we reject Carter's challenge to Counts 2 and 4.

### C. *Sufficient Evidence Supported Carter's Convictions on Counts 2 and 4.*

Carter also argues that his convictions on Counts 2 and 4 lacked sufficient evidence. He asserts that the government failed to prove that he drove the Victims from Georgia to Florida with the intention that they perform sex work in Miami; instead, he claims the evidence shows that his dominant purpose was for Adult Victim to work in an adult-entertainment club, with the sex work

happening incidentally after the club did not hire Adult Victim and the trio was already in Florida. The government argues that Carter failed to properly raise the issue before the district court and, even if not reviewed for plain error, that Carter cannot meet the high burden of showing insufficient evidence. We find that Carter preserved this issue by discussing Adult Victim's potential employment in an adult-entertainment club in Miami during his oral motion for judgment of acquittal before the district court.

As to the merits, Carter must establish that, viewing the evidence and drawing all inferences in favor of the government, no reasonable jury could have convicted him. *See Al Jaberi*, 97 F.4th at 1322. He argues that the Supreme Court has required that a defendant's intention that a victim engage in commercial sex work "be the dominant motive of such interstate movement." *Mortensen v. United States*, 322 U.S. 369, 374 (1944). But binding precedent has limited *Mortensen*'s reasoning to its facts and held that it is "enough that one of the dominant purposes [of the interstate transportation] was prostitution." *Forrest v. United States*, 363 F.2d 348, 349 (5th Cir. 1966);[1] *see also United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012); *cf. United States v. Gaudet*, 933 F.3d 11, 16 (1st Cir. 2019) (requiring only that the intent was "one of the several motives or purposes" (citation modified)). Carter concedes as much in his reply brief.

---

[1] Decisions of the former Fifth Circuit issued prior to the close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Viewing the substantial evidence in the light most favorable to the government, we have no trouble finding that one of Carter's dominant purposes in transporting the Victims to Miami was to facilitate commercial sex work. The "Sweet Double Trouble" advertisement that he posted *before* they departed Georgia alone demonstrates this intent, and the government introduced a substantial amount of additional evidence, as previously discussed. So we reject Carter's challenge to the sufficiency of the evidence.

## IV.   CONCLUSION

We **AFFIRM** Carter's convictions.